UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MATTHEW GROENIG, an individual,<br><br>     Plaintiff,<br><br>     v.<br><br>SAFECO INSURANCE COMPANY OF AMERICA, BUSINESS ENTITY DOES I through X, DOES I through X,<br><br>     Defendants. | Case No. 1:20-cv-00538-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are two motions: Defendant Safeco Insurance Company of America's  Motion for Summary Judgement (Dkt. 31) and Plaintiff Matthew Groenig's Motion to Amend the Complaint to Include a Claim for Punitive Damages (Dkt. 27). The Court heard oral argument on both motions on September 14, 2023. For the reasons explained below, the Court will partly grant and partly deny Safeco's motion for summary judgment. The Court will deny the motion to amend the complaint to add a claim for punitive damages.

## FACTUAL BACKGROUND

**A.     The Loss**

Groenig owns a rental property in McCall, Idaho. On March 23, 2019, his tenant told him that water was dripping from the ceiling and down the wall in one of the bedrooms. He reported the loss to Safeco, which insured the property under a Landlord Protection Policy. Groenig had trouble finding a contractor to repair the damage, and a Safeco employee likewise informed Groenig she had been unable to locate a contractor or a mitigation company in the area. *Dearing Dec. Ex. JJ,* Dkt. 37-1, at 29. On April 16, 2019, however, Groenig told Safeco he had located a contractor, Restoration North, that could do the work. *Id.*

Two days later, on April 18, 2019, Safeco employee Ashley Gliwa inspected the property and estimated repair costs at $2,666.29. *Apr. 18, 2019 Letter, Ex. D to Dearing Dec.*, Dkt. 37, at 9. The following week, another Safeco employee, Beatriz Morena, followed up. She emailed Groenig, stating, "We have afforded coverage for this claim therefore, you can move forward with Restoration [North] in order to protect your home from further damage." *See Apr. 23, 2019 email, Ex. B to Dearing Dec.,* Dkt. 37, at 7.

**B.     The Contractor**

On April 24, 2019, the day after receiving that email from Moreno, Groenig entered into an Emergency Services Agreement with Restoration North, under which he engaged the company "to perform services required as a result

of . . . water . . . or other casualty damage upon the Property, and to furnish the

materials, equipment, and labor necessary to reasonably protect and secure the

Property and its contents from further damage . . . ." *Apr. 24, 2019 Agmt.,* Dkt. 31-

2. Within the agreement, Groenig acknowledged that, because of the "emergency

nature of the Services," Restoration North was not capable of providing him with a

detailed written estimate or an approximate completion date. *Id.*

Groenig also agreed to assign insurance proceeds for any work that

Restoration North performed directly to Restoration North. The assignment

provision states:

> ASSIGNMENT OF INSURANCE PROCEEDS: Owner
> irrevocably assigns to Restoration North that portion of the
> proceeds of any insurance coverage that relates to the Services
> performed by Restoration North, as well as any non-monetary
> post-loss benefits, including but not limited to a right to
> appraisal. Additionally, Restoration North has the right to
> utilize the Assignment of Benefits attached as Exhibit B, which
> was signed by the Owner contemporaneously with this
> agreement. Restoration North's remedies under this Agreement
> are cumulative.

*Agmt.*, Dkt. 31-2, at 13. The referenced "Exhibit B" in that provision was attached

to the contract, and contains this verbiage:

> I hereby assign any and all insurance rights, benefits, and
> proceeds under the above-referenced policy for Services
> rendered by Restoration North, LLC. I hereby authorize direct
> payment of any benefits or proceeds to Restoration North, LLC,
> as consideration for any Services made by Restoration North,
> LLC. I hereby direct my insurance carrier Liberty Mututal [sic]
> Insurance to release any and all information requested by

> Restoration North, LLC, its representative, or its attorney for
> the direct purpose of obtaining actual benefits to be paid by my
> insurance carrier to Restoration North for Services rendered or
> to be rendered. In this regard, I waive my privacy rights. This
> assignment should be construed purely as an assignment of
> benefits related to a specific claim and not to the insurance
> policy between insurer and insured as a whole.

*Id.* at 14. The agreement also contains the following power-of-attorney clause:

> POWER OF ATTORNEY TO INSTITUTE SUIT: Upon the
> occurrence of the default of nonpayment under this Agreement,
> Owner hereby irrevocably constitutes and appoints Restoration
> North as Owner's true and lawful attorney-in-fact to institute a
> lawsuit against Owner's insurance carrier for nonpayment. This
> power of attorney is irrevocable and is coupled with an interest.

*Id.*

## C.    The Conflict

With the Emergency Services Agreement in place, Restoration North began

work on the property, and in June, invoiced plaintiff for $24,889.89. *See Ex. B to

Bello Dec.,* Dkt. 31-4. One invoice, for $17,586.14, was for water-mitigation work;

the other, for $7,303.75, was for interior repair work. On June 20, 2019,

Restoration North forwarded these invoices to Safeco. In response, and specifically

regarding the $7,303.75 invoice, Safeco employee Moreno said she "would need a

breakdown for the whole job which should include roof and interior repairs." *June

20, 2019 email, Ex. M to Dearing Dec.*, Dkt. 37, at 80. She further stated that three

specific line items in that invoice—"supervision project management," "O&P," &

"Final Cleaning"—were not approved. *Id.* On July 8, 2019, Restoration North re-

submitted the $7,303.75 estimate, this time including additional documentation. *See Dearing Dec. Ex. N*. Dkt. 37, at 81.

Groenig says the "conflicts" over the Restoration North estimates prompted Safeco to re-inspect the property on July 18, 2022. *Pl. Fact Stmt.*, Dkt. 35, at 2. This time, Safeco estimated the water-mitigation work at $3,744.76 and the restoration work (including a roof repair) at $5,729.31. *See Exs. C & D to Bello Dec.,* Dkt 31-4, at 56, 69. Safeco informed Groenig of the new estimate and told him he would be receiving an additional $2,963.55. *See Ex. G to Dearing Dec.*, Dkt. 37. Additionally, although Restoration North's initial estimates had not included roof-repair work, toward the end of July, Safeco let Groenig know it wanted to have an engineer inspect the roof, as Restoration North was now requesting a full roof replacement. (At the time, Restoration North had not yet submitted an estimate for a complete reroof.) *See Bello Dec.* ¶ 9; Dkt. 31-3; *July 29, 2019 email from Bello to Groenig, Ex. O to Dearing Dec.*, Dkt. 37, at 137.

## D.    The Appraisal

By the time Restoration North was recommending a full roof replacement, it had hired an attorney, Joshua Ehmke, who informed Safeco that Groenig had assigned rights under the insurance policy to Restoration North. *July 18, 2019 Letter, Ex. E to Bello Dec.*, Dkt. 31-4 at 81. In August 2019, Safeco acknowledged the assignment and then invoked the insurance policy's appraisal provision. *Aug. 6,*

*2019 Letter, Ex. F to Bello Dec.,* Dkt. 31-4, at 87. Safeco said it would seek to have three items appraised: (1) water mitigation damage – noting the difference between Restoration North's $17,586.14 and Safeco's $3,744.76 estimate; (2) Restoration North's charges for supervision, final cleaning, and overhead and profit; and (3) the estimated cost to repair the roof. *See id.* at 89-90.

Additionally, around this same time frame, Safeco informed plaintiff that it would be dropping him as a customer. *See Aug. 1, 2019 Groenig email to Bello, Ex. E to Dearing Dec. Compl.*, Dkt. 37, at 18. Groenig had paid all policy premiums and had had only two claims (including this one) in 10 years.

In any event, once the appraisal clause was invoked, both sides selected their appraisers. Ehmke objected to Safeco's selection of Patrick Mountjoy, however, saying that he had shown "personal disdain for Restoration North." *Sept. 10, 2019 Letter, Ex. HH to Dearing Dec.*, Dkt. 37-1, at 25. Specifically, Ehmke said Restoration North had previously "had to hire an attorney against Mr. Mountjoy in the past due to disparaging and harassing comments made to and about Restoration North, including but not limited to intentional interference with business expectations between Restoration North and its customers." *Id.* In response to these concerns, Mountjoy told Safeco that while he "had a negative opinion of Restoration North's business practices that are based on fact and experience," he was not "unfairly prejudiced" against the company. *Oct. 3, 2019 email from*

MEMORANDUM DECISION AND ORDER - 6

*Mountjoy to Bello*, *Ex. LL to Dearing Dec.*, Dkt. 37-1 at 31. He said he believed he was a "competent and disinterested appraiser," which is what the policy required. (The relevant portion of the insurance policy states, "If you and we do not agree on the amount of the loss, . . . then, on the written demand of either, each shall select a competent and disinterested appraiser . . . ." *Ins. Policy*, Dkt. 31-4, at 36.)

Ultimately, Safeco did not select a different appraiser, and the parties moved forward with the appraisal process. In the middle of that process, in early October 2019, Restoration North submitted a revised estimate of $107,112.41, which now included estimated costs for replacing the entire roof. *Bello Dec.* ¶ 13, Dkt. 31-3; *Ex. H thereto,* Dkt. 31-5, at 5-29. After receiving that estimate, Safeco retained an engineer, Brian Hansen, to inspect the roof. Hansen conducted his inspection on November 14, 2019. He concluded that the damage to the roof was not caused by ice dams, but instead by "ice dam removal efforts" and normal wear and tear. *Bello Dec.* ¶ 14, Dkt. 31-3; *Ex. T to Dearing Dec.*, Dkt. 37, at 147. In January 2020, based on Hansen's report, Safeco denied coverage for the roof replacement. *Jan. 9, 2020 Letter to Groenig*, *Ex. M to Bello Dec.*, Dkt. 31-5, at 63-65; *Ex. S to Dearing Dec.*, Dkt. 37, at 144.[1]

---

[1] Groenig also points out that in November 2019—before Safeco had received Hansen's report—Groenig expressed concern about the state of his roof heading into the winter months. (Continued)

A couple of months later, in March 2020, with the appraisal process still ongoing, Groenig informed Safeco that additional water damage had been located in the crawlspace of the property. *See Ex. N to Bello Dec.,* Dkt. 31-5, at 82 of 117. Groenig said this damage related to the original, March 2019 loss. Safeco investigated the issue, however, and, on April 17, 2020, denied coverage on the grounds that any damage to the crawlspace was caused by "groundwater and seepage" rather than an ice dam. *Ex. O to Bello Dec.*, Dkt. 31-5, at 85.

Groenig says that during February and March 2020, while the appraisal process was ongoing, Mountjoy took actions that illustrated his bias. He points to two specific events:

First, in February 2020, Mountjoy objected to Restoration North's appraiser's suggestion that the parties meet on site, with witnesses, to see if they couldn't agree on damages. Mountjoy explained his reasoning to Safeco as follows: "I objected to an on-site inspection, as the damaged area is one bedroom. I objected to meeting on site with witnesses. We have none. I objected to a 'sit-down' with Berger to see if we could agree on damages. This is not likely, so let's

_____

He asked how he should mitigate the risk to his property. Ms. Bello recommended a temporary tarp and agreed to reimburse for snow removal "until the [Appraisal] Umpire is selected and the final decisions are made." *Dearing Dec.*, *Ex. Q.*  Later, on March 20, 2020, plaintiff asked when he would be reimbursed for snow removal costs. Ms. Bello initially said Safeco wouldn't pay for such costs, but then reversed herself and authorized $1,100 in snow removal costs after Groenig reminded her of that November 2019 email. *Dearing Dec., Ex. CC.*

not waste additional expense. These are all items that will increase the cost of this

appraisal substantially and not benefit Safeco. I think Berger [Restoration North's

appraiser] wanted a vacation to Idaho." *Feb. 7, 2020 email to Bello*, *Ex. NN to*

*Dearing Dec.*, Dkt. 37-1, at 33.

Second, on March 19, 2020, Mountjoy sent an email to Bello, of Safeco,

again expressing concerns about Restoration North. This email states:

> I have responded aggressively to the actions by both One Call
> Claim Solutions and Restoration North. I am aware of multiple
> similar claims being put through the appraisal process by these two
> outfits, costing carriers a mint. They need to be confronted and
> exposed and reported to the Idaho Dept. of Insurance, by all
> involved carriers, on the claims they take over.

*March 19, 2020 email*, *Ex. V to Dearing Dec.*, Dkt. 37, at 152. Shortly after

Mountjoy sent this email, both sides submitted their appraisals to the umpire.

## E.     The Declaration

In June 2020, the appraisers determined the value of the loss at $24,223.87.

That appraisers' declaration did not determine the loss for roof repairs or

crawlspace damage. In that regard, the declaration states:

> The appraisers' role was limited to determination of the mitigation
> amounts for the bedroom and repairs to the bedroom *and
> specifically excludes any amounts for roof repairs or crawl space
> damage which were determined to be coverage issues to be
> resolved by the parties.*

*June 12, 2020 Declaration of Appraisers*, *Ex. R to Bello Dec.*, Dkt. 31-5, at 106 of

117 (emphasis added). The appraisers' determination of the loss – at $24,223.87 –

was within a few hundred dollars of Restoration North's initial estimate. (Recall that Restoration North's June 2019 invoices totaled $24,889.89.) Safeco's appraiser had valued the loss at $12,223.87. Restoration North's appraiser, by contrast, had valued the loss at $100,475.73, although that amount included a complete roof repair. With the roof repair costs excluded, Restoration North's appraiser's estimate was $30,450. *Bello Dec.*, ¶ 21, *Ex. P thereto.* Shortly after the appraisers issued their award, Safeco paid Restoration North $18,112.82. *See Ex. S to Bello Dec.*, Dkt. 31-5, at 107. Groenig asked Safeco to pay him directly, but Safeco declined, in light of the assignment provision discussed above. *See id.; Ex. T to Bello Dec.*, Dkt. 31-5, at 109.

## F.    The Lawsuit

In October 2020, Groenig sued Safeco in state court. Among other things, Groenig alleges that Safeco wrongly refused to pay benefits under the policy. Regarding the roof, he alleges that "the loss at issue was caused by ice dams, not wear and tear or mechanical damage as claimed by Safeco." *Compl.,* Dkt. 1-2, ¶ 58. More broadly, Groenig alleges claims for: (1) estoppel; (2) breach of contract; (3) bad faith; and (4) intentional infliction of emotional distress. He also seeks attorneys' fees under Idaho statutory law.

## LEGAL STANDARD REGARDING SUMMARY JUDGMENT

Summary judgment is appropriate where a party demonstrates that, as to any

claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact "that may affect the outcome of the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact and a favorable judgment is due as a matter of law. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must identify facts sufficient to show a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party must go beyond the pleadings and show "by ... affidavits, or by the depositions, answers to interrogatories, or admissions on file," that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324. The Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## ANALYSIS

### A.    Assignment

Safeco argues that Groenig lacks standing to sue because of the

"indisputable fact that Mr. Groenig irrevocably assigned any claim he may have against Safeco." *See Mtn. Mem.*, Dkt. 31-1, at 2. But the assignment provision in the Restoration North/Groenig contract isn't that broad. It doesn't say Groenig assigned all claims under the insurance contract to Restoration North. Rather, it says Groenig assigned "to Restoration North *that portion of the proceeds of any insurance coverage that relates to the Services performed by Restoration North*, as well as any non-monetary post-loss benefits, including but not limited to a right to appraisal." *Mar. 24, 2019 Agmt.,* Dkt. 31-2, at 12 (emphasis added).

An assignment is just like any other contract, and the Idaho Supreme Court has explained that "to determine the intent of the assignment, the Court looks to the contract between the assignor and assignee." *Purco Fleet Servs. Inc. v. Idaho State Dep't of Finance,* 90 P.3d 346, 351 (Idaho 2004)*.* The intent of the parties here, as determined by the language of contract, was to enable Restoration North to be paid directly by the insurer for services it had actually performed and have the right of a post-loss appraisal related to such services. Notably, the opening sentence of the assignment provision refers to services *performed* by Restoration North. As such, Groenig did not assign away his tort claims (for bad faith and intentional infliction of emotional distress) so the assignment does not prevent him from bringing those claims. Similarly, Groenig may pursue his contract claims in which he alleges that Safeco breached its contractual obligations under the policy by failing to provide

coverage for a roof replacement or damage to the crawlspace. *Cf. Salyer v. Tower Hill Select Ins. Co.*, 367 So. 3d 551, 555 (Fla. Dist. Ct. App. 2023) (explaining that "an assignment of benefits to a third-party contractor does not foreclose a homeowner's standing to sue his or her insurer when the assignment is limited to work the contractor performs, and the contractor performs either a specific category of work … or no work at all …") (internal citations omitted). Restoration North did not perform either category of work and the appraisers did not determine the amount of loss related to those items.

Safeco directs the Court's attention to *Blue Cross & Blue Shield of Georgia, Inc. v. Bennett*, 477 S.E.2d 442 (Ga. Ct. App. 1996). But that case is not binding and is distinguishable in any event. There, the plaintiff assigned "all benefits and payments now due and payable or to become due and payable to me under any insurance policy . . . for this or any other period of hospitalization and related outpatient care." *Id.* at 443. That language is broader than the language used in the Groenig/Restoration North contract. Granted, the Groenig Restoration North contract authorizes Restoration North to "utilize" a form assignment, which was appended to the contract as Exhibit B. Exhibit B, in turn says: "I hereby assign any and all insurance rights, benefits, and proceeds under the above-referenced policy for Services rendered by Restoration North, LLC." *Agmt.,* Dkt. 31-2, at 15. But when Exhibit B is considered in context, it is apparent that the parties simply

intended for Restoration to be able to use that form to effectuate the underlying, *limited* assignment of proceeds relevant to work Restoration North had performed.

Moreover, returning to binding authority, given the Idaho Supreme Court's guidance regarding assignment contracts, the Court concludes that neither Restoration North nor Groenig intended for Groenig to assign all claims under his insurance contract to Restoration North. For these reasons, the Court will deny Safeco's motion to the extent it contends that the assignment provision bars Groenig from pursuing the claims alleged here.

## B.    Breach of Contract

Safeco argues that because it has complied with the appraisal process, it is entitled to summary judgment on all claims. The Court disagrees.

Starting with the breach-of-contract claim, Groenig alleges that Safeco breached its obligations under the policy by failing to cover the cost of a full roof replacement. *See, e.g., Compl.*, Dkt. 1-2, ¶ 58. The complaint's allegations are also sufficiently broad to capture Groenig's contention that Safeco breached the contract by failing to cover the cost of repairing the crawlspace. *See, e.g., Compl.,* Dkt. 1-2, ¶¶ 56-60. Restoration North did not replace the roof or repair the crawlspace; the appraisers did not determine the amount of the loss as it relates to those items; and Safeco denied coverage as to both items – meaning that it did not issue proceeds to Restoration North for any such work. Groenig's breach-of-

contract claim thus falls outside the scope of the appraisal determination and he is free to pursue that claim.

## C.   Bad Faith

Groenig also claims that Safeco acted in bad faith. To recover on that claim, he must show that: "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Parks v. Safeco Ins. Co. of Illinois,* 376 P.3d 760, 766 (Idaho 2016).

Groenig's bad-faith claim fails at the second and fourth elements. The second element requires Groenig to show that his claims were not fairly debatable. "Fairly debatable means that there was a reasonable dispute or legitimate question over the 'eligibility, amount or value of the claim.'" *Cedillo v. Farmers Ins. Co.*, 408 P.3d 886, 892 (Idaho 2017) (citation omitted). Here, there is undisputed evidence showing that the value and eligibility of the claims at issue were reasonably disputed. There were conflicting estimates and reports related to the mitigation work, the interior repair work, the exterior roof repair work (including the need for a complete roof replacement), and the damage to the crawlspace. Notably, although Groenig has complained that Safeco used a biased appraiser, other individuals rendered conflicting estimates and reports, typically before

Mountjoy was involved.[2] And even viewing this evidence in the light most favorable to Groenig, these estimates and reports were reasonable. As such, the Court is in a position to determine, as a matter of law, that Groenig's claims are "fairly debatable," meaning Safeco is entitled to summary judgment. As one court has explained, "Courts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify the denial of that claim." *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. Ct. App. 1992). Seen in that light, Safeco certainly had evidence justifying its refusal to pay the amounts that were being demanded.

Idaho courts have granted summary judgment in favor of insurers in similar situations. *See, e.g., Roper v. State Farm Mut. Auto. Ins. Co.*, 958 P.2d 1145, 1148 (Idaho 1998) ("Considering the complex medical details of these claims and the differing responses by the numerous doctors involved, it is evident these claims were 'fairly debatable'"); *Anderson v. Farmers Ins. Co. of Idaho*, 947 P.2d 1003 (Idaho 1997) ("There is no evidence to support Anderson's contention that her claim was not reasonably in dispute. Therefore, there is no genuine issue of material fact concerning her bad faith claim."), *disapproved of on other grounds in*

---

[2] Even accepting plaintiff's contention that Mountjoy was biased, the Court is not persuaded by plaintiff's contention that the engineer Mountjoy recommended must also be seen as biased.

*Martin v. State Farm Mut. Auto Ins. Co.*, 61 P.3d 601, 604 (Idaho 2002). Likewise, many a court has recognized that the "fairly debatable" issue can be decided as a matter of law if there is no dispute as to the underlying facts and the insurer took a reasonable position. *See, e.g., Rodda v. Vermeer Mfg.*, 734 N.W.2d 480, 483 (Iowa 2007) (stating that whether a claim is fairly debatable can generally be determined by the court as a matter of law); *see also Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 108 Cal. Rptr. 2d 776, 785, 787 (Cal. Ct. App. 2001) (concluding that "as long as *there is no dispute as to the underlying facts*, it is for the court, not a jury, to decide whether the insurer had 'proper cause' [to deny the insured's claim]"); *Rice v. State Farm Fire &. Co.*, 430 S.E.2d 75, 78 (Ga. Ct. App. 1993) (observing that "it is the very fact that certain factual issues regarding the merits of a claim are in genuine conflict that causes there to be no conflict, as a matter of law, whether an insurance company had reasonable grounds to contest a particular claim.").

In this case, considering the varying estimates and reports submitted and relied upon by Safeco, it is evident that Groenig's claims were "fairly debatable." For that reason, Groenig's bad-faith claim fails as a matter of law.

Turning to the fourth element, which requires plaintiffs to show they suffered non-contract damages as a result of the bad-faith conduct, Groenig's claim fails here as well. He did not come forward with any non-contract damages he

allegedly suffered as a result of Safeco's conduct. Indeed, in the briefing, Groenig stated that he would not argue or respond on this front, because Safeco "makes no arguments as to the . . . fourth element[]." *Plaintiff's Response,* Dkt. 36, at 10, But Safeco had made precisely that argument. In its moving papers, Safeco said, "The facts of this case also establish that even if Mr. Groenig could establish the other elements of an insurance bad faith claim, *he cannot establish the existence of damages not fully compensable at contract*." *Motion Mem.*, Dkt. 31-1, at 12-13 (emphasis added). On this record, given the failure to articulate or demonstrate any non-contract damages, the Court fins and additional, independent reason to summarily adjudicate the bad-faith claim in Safeco's favor.

## D.    Intentional Infliction of Emotional Distress

The Court will also grant summary judgment in Safeco's favor on the emotional distress claim. To recover on this claim, Groenig would need to show that (1) Safeco's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the wrongful conduct and plaintiff's emotional distress, and (4) the emotional distress was severe. *See, e.g., Johnson v. McPhee*, 210 P.3d 563, 562 (Idaho 2009). The Idaho Supreme Court has explained that only the most extreme conduct will generate liability for this tort. *See id.* "The conduct must be not merely unjustifiable; it must rise to the level of 'atrocious' and 'beyond all possible bounds of decency,' such that it would

cause an average member of the community to believe that it was outrageous." *Id.*

Summary judgment on such a claim "is proper when the facts allege conduct of the

defendant that could not reasonably be regarded as so extreme and outrageous as to

permit recovery for intentional or reckless infliction of emotional distress."

*Edmonson v. Shearer Lumber Prods.,* 75 P.3d 733, 741 (Idaho 2003). Additionally,

even if the first three elements are satisfied, summary judgment in a defendant's

favor is proper if plaintiff has failed to come forward with evidence regarding the

fourth element – that plaintiff suffered severe emotional distress. *See, e.g.,*

*Jeremiah v. Yanke Machine Shop, Inc.,* 953 P.2d 992, 999 (Idaho 1998) (holding

that "being seriously frustrated" from enduring a hostile and abusive workplace

was insufficient); *Payne v. Wallace,* 32 P.3d 695, 698 (Idaho Ct. App. 2001)

(holding that a child's screams, fear, and loss of sleep from seeing his mother

being yelled at by another motorist after a car accident were insufficient).

Here, Groenig failed to come forward with any evidence that he suffered an

emotional reaction so severe that no reasonable could be expected to endure it.

Safeco is therefore entitled to summary judgment on this claim.

## E.   Estoppel

The Court will also grant summary judgment in Safeco's favor on the

estoppel claim. "To prevail on a promissory estoppel claim, a party must prove the

existence of all four elements of promissory estoppel: (1) reliance upon a specific

promise; (2) substantial economic loss to the promisee as a result of such reliance; (3) the loss to the promisee was or should have been foreseeable by the promisor; and (4) the promisee's reliance on the promise must have been reasonable. To avoid summary judgment on his promissory estoppel claim, a party must provide proof of each element of his claim." *Zollinger v. Carrol*, 49 P.3d 402, 404 (Idaho 2002) (internal citations omitted).

The central allegations of Groenig's estoppel claim are found in paragraphs 53 through 55 of the complaint, which allege:

> 53.   Plaintiff reasonably relied upon the promise and agreement of Safeco to cover his claim when entering into an agreement with Restoration North and authorizing it to commence work on the property.
>
> 54.   By inducing Plaintiff to enter into a contract with Restoration North, and then refusing to honor its agreement to pay Restoration North, Safeco benefited and profited from its change in position.
>
> 55.   As a result of Safeco's unreasonable change in position, Safeco is estopped from denying coverage on this claim.

Here, the parties do not dispute the fact that Safeco paid Restoration North for the work that company performed. And Groenig has not come forward with any evidence that Restoration North is saying he owes additional monies.[3] Seen in

---

[3] Such an event seems unlikely, given that Restoration North pursued the appraisal (Continued)

that light, and even taking into account the fact that Restoration North was not paid in full until the conclusion of the appraisal process, Groenig has not explained how he suffered any damages – much less "a substantial economic loss," which is a required element of an estoppel claim. *See generally Zollinger,* 49 P.3d at 404. [4]

In his briefing, Groenig suggests his claim is broader than Safeco's alleged refusal to pay Restoration North for work that company performed. From what the Court can gather, Groenig is arguing that on April 23, 2019, when Safeco employee Moreno sent the email described above—the one telling him that Safeco had afforded coverage for his claim and authorizing him to move forward with Restoration North—Safeco was promising to cover the entire amount of his claim *however Restoration North might value it in the future*, and that he reasonably relied on that promise. This would presumably include the cost of a total reroof and repairing damage to the crawlspace—neither of which was under discussion at the time Moreno sent her email. Indeed, because Safeco has, in fact, paid Restoration

_____

process and thus agreed on the amount of the loss (aside from the alleged need for a full roof replacement and repair to the crawlspace).

[4] In response to Safeco's motion for summary judgment, plaintiff began his argument with this: "Safeco argues that Mr. Groenig's estoppel claim should be denied because Safeco "did in fact honor" Mr. Groenig's agreement with Restoration North. *That is demonstrably incorrect.*" *Response,* Dkt. 36, at 11 (emphasis added). But in the next breath, Groenig says Restoration North *was* paid. He says, "Compensation wasn't forthcoming until after the appraisal process." *Id.* In other words, Groenig seems to be conceding that Restoration North was, in fact, paid after the arbitrators issued their award. Plus, in his factual statement, Groenig didn't point to any evidence that he owe monies to Restoration North for work that company performed.

North for other work (the water mitigation and the restoration work – minus roof repairs), as the Court views it, the remaining issue on the estoppel claim is whether Safeco is estopped from denying coverage to the extent of paying for a complete reroof and damage to the crawlspace.

Even assuming Moreno's email was the requisite "specific promise" on this front, Groenig must demonstrate that he *reasonably* relied on such a promise. As a general rule, whether a party's reliance was reasonable is a question of fact for the jury. *See Young v. State Farm Mut. Auto. Ins. Co.*, 898 P.2d 53, 57 (Idaho 1995). But in this case, the undisputed evidence leads to only one conclusion – no juror could conclude Groenig reasonably relied on Moreno's April 23, 2019 email to mean that Safeco would cover a complete reroof (later recommended) and damage to the crawlspace (later discovered). To be sure, Moreno's email told Groenig that Safeco had afforded coverage and authorized him to move forward with Restoration North. But just five days before she sent that email, another Safeco employee had inspected the property and estimated the repair costs at less than $3,000. Groenig had been informed of that estimate by the time Moreno sent her email. Given that factual context, it is not reasonable for Groenig to have concluded Safeco was promising to cover his claim *as later valued by Restoration North*, without regard to Safeco's earlier estimate. For this additional reason, the Court will summarily adjudicate the estoppel claim in Safeco's favor.

**F.     Punitive Damages**

Finally, the Court will deny Groenig's motion to amend his complaint to add a claim for punitive damages. A motion for leave to amend for the specific purpose of adding a claim for punitive damages is governed by Idaho Code § 6-1604, which imposes two important limitations on litigants seeking punitive damages: one at the pleading stage and another at the trial stage.

At the pleading stage, the statute prohibits plaintiffs from claiming punitive damages in their initial complaint. Instead, upon a pretrial motion and hearing, the plaintiff must seek to "amend the pleadings to include a prayer for relief seeking punitive damages." Idaho Code § 6-1604(2). A court, in turn, should permit such an amendment only if, "after weighing the evidence presented, the court concludes that the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." Idaho Code § 6-1604(2).

The next limitation imposed by § 6-1604 applies at the trial stage. To succeed on a claim for punitive damages, "the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." Idaho Code § 6-1604(1). That means showing "the requisite intersection of two factors: a bad act and a bad state of mind." *Todd v. Sullivan Const. LLC*, 146 Idaho 118, 123 (2008)

(citing *Myers v. Workmen's Auto. Ins. Co.*, 140 Idaho 495, 503 (2004)). A bad act

is an "extreme deviation from reasonable standards of conduct." *Seiniger Law*

*Office, P.A. v. North Pacific Ins. Co.*, 145 Idaho 241, 250 (2008). A bad state of

mind is "an extremely harmful state of mind, whether that be termed malice,

oppression, fraud or gross negligence; malice, oppression, wantonness; or simply

deliberate or willful." *Myers*, 140 Idaho at 503.

    As this Court has previously explained, there are two prevailing approaches

to interpreting the pleading-stage standard set forth in § 6-1604(2): the Rule 50

approach and the evidence-balancing approach. *See Davis v. Blast Props., Inc.*, No.

1:21-cv-00218-BLW, 2023 WL 1737311, at *3 (D. Idaho Feb. 3, 2023).

> Under the first approach, in determining whether to permit a claim for
> punitive damages, a court views all evidence in the movant's favor without
> assessing credibility or resolving factual disputes and asks whether a
> reasonable jury could award punitive damages. This approach finds support
> in the statutory language that the trial court is to determine whether the
> plaintiff can present evidence "at trial sufficient to support an award of
> punitive damages."
>
> Under the second approach, in contrast, a court must hold an evidentiary
> hearing and weigh conflicting evidence, make credibility determinations,
> and decide how likely the movant is to ultimately obtain punitive damages.
> This approach finds support in the statutory language that the trial court is to
> determine the sufficiency of the plaintiff's evidence "after weighing the
> evidence presented."

*Id.* This Court recently certified the following question to the Idaho Supreme

Court: "Is the Rule 50 approach . . . the proper means for the trial court to comply

with its obligation under Idaho Code § 6-1604(2), to determine, "after weighing

the evidence presented," whether the plaintiff has established "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages?" *See Davis v. Blast Props., Inc.*, No. 50491-2023 (Idaho 2023).

As it has done in the past, however, the Court will move this case forward by presuming that the Rule 50 approach is appropriate.

Turning to the issue at hand, after having carefully reviewed the record, the Court finds that Groenig has not shown Safeco performed bad acts with a bad state of mind. "It is well established that punitive damages are unavailable in routine, ordinary breach of contract cases, however, this 'should not be construed as a blanket prohibition against punitive damages in breach of contract claims.'" *Thurston Enters. Inc. v. Safeguard Bus. Sys., Inc.*, 435 P.3d 489, 505 (Idaho 2019) (citations omitted). Rather, "numerous situations arise where the breaking of a promise may be an extreme deviation from standards of reasonable conduct, and, when done with knowledge of its likely effects, may be grounds for an award of punitive damages." *Id.* (citation omitted). Still, though, when the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, a motion to assert punitive damages will not be allowed. *See, e.g., Strong v. Unumprovident Corp.*, 393 F. Supp. 2d 1012, 1026 (D. Idaho 2005) (Plaintiff did not established reasonable likelihood of proving "the requisite 'extremely harmful state of mind' and 'extreme deviation from

reasonable standards'" because of conflicting evidence)). Ultimately, deciding whether to allow a plaintiff to add a claim for punitive damages rests within the sound discretion of the trial court. *See, e.g, Manning v. Twin Falls Clinic & Hosp., Inc.,* 830 P.2d 1185, 1190 (Idaho 1992).

Applying the above standard here, and after having weighed the evidence presented in the parties' submittals and having considered the record in this matter, the Court finds that the facts comprising Safeco's alleged bad acts and bad state of mind do not rise to an extreme deviation of industry standards or the requisite extremely harmful state of mind needed to pursue a claim for punitive damages. Accordingly, the Court will deny the motion to amend the complaint.

## ORDER

**IT IS ORDERED that:**

1.      Defendant's Motion for Summary Judgment (Dkt. 31) is **GRANTED IN PART AND DENIED IN PART** as explained above.

2.      Plaintiff's Motion to Amend to Include a Claim for Punitive Damages (Dkt. 27) is **DENIED.**

3.      The Court will schedule a trial-setting conference in a separate order.

DATED: September 21, 2023

B. Lynn Winmill
U.S. District Court Judge